[No. 18426. *En Banc*. January 9, 1925.]

THE STATE OF WASHINGTON, *Respondent*, v. WILLIAM HOFFMAN, JR., *Appellant*.[1]

INTOXICATING LIQUORS (28)—OFFENSES—MANUFACTURE—STATUTES. A conviction of manufacturing intoxicating liquor, in violation of Rem. Comp. Stat., § 7309, is sustained by evidence of the possession of a still in full operation and product in process of manufacture, although no intoxicating liquor had actually been produced.

SAME (28, 50)—OFFENSES—MANUFACTURE—EVIDENCE—SUFFICIENCY. In such a case, the purpose for which the mash was to be used is sufficiently shown by admissions of the defendant that he was associated in the operation of the still with a man of bad reputation and was to share in the proceeds of sales, although there was no direct evidence that the still and mash was such as would produce intoxicating liquor (TOLMAN, J., dissenting).

Appeal from a judgment of the superior court for King county, Gilliam, J., entered September 13, 1923, upon a trial and conviction of unlawfully manufacturing intoxicating liquor. Affirmed.

*Dan Earle,* for appellant.

*Malcolm Douglas* and *R. L. Bartling,* for respondent.

[1]Reported in 232 Pac. 278.

MAIN, C. J.—By information the defendant was charged with unlawfully manufacturing intoxicating liquor for the purpose of sale. At the close of the state's case, the defendant made a motion for dismissal, which was denied, and at the close of all of the evidence moved for a directed verdict, which was also denied. From the judgment entered upon the verdict, the defendant appeals.

It is first urged that, since no intoxicating liquor was actually produced, the appellant was not guilty of manufacturing such product. In other words, the question is, whether the liquor must have an actual existence and not a mere- potential one. One of the officers who made the arrest testified as follows:

"A. We went out to this house,—this man's residence,—about eight o'clock in the evening, with a search warrant, and went into the house and found Mr. Hoffman's wife up there and another man in the house. We went down into the basement and found a 50-gallon still in operation. The still was full of mash, and there was about 200 gallons of mash in barrels in the basement. We arrested this man who was there and brought him to the station. Mr. Hoffman was not there at the time, but we had some information that night that he was up at this other man's house,—up at 1502 16th Avenue, and so we got a search warrant and went out and found Mr. Hoffman and brought him down to the station and charged him with the manufacture of intoxicating liquor in violation of the prohibition law. Q. Do you recall the name of the man you found in Hoffman's house? A. St. Clair. That was the name he gave that time. Q. After you found St. Clair at Hoffman's house you say you got a search warrant out for St. Clair's house and found Hoffman at St. Clair's house— A. Yes, Mr. Hoffman and this — Q. The same day. Give Mr. Hoffman's residence on the 29th day of May, 1923. A. 4103 41st South, I think. Q. That is in the city of Seattle, King county? A. (Witness looks at paper) Yes, sir, 4103 43rd South. Q. Did

you ever have any conversation with Hoffman in regard to whether he had anything to do with the still or not? A. I talked with him that night at this place, 1502 16th Avenue, where we arrested him, and I asked him why he mixed up with this man, because he had a reputation, and we had got him before,—this same man under a different name,—operating a still, and he did not bear a very good reputation. I asked him why he went in with him and he said at first he did not want to go in with him, and that he held out for a long time and did not care to mix up with that kind of business, but finally St. Clair made it plain enough that they could make some money, and he finally agreed to go in with him and he allowed this man St. Clair to take his own truck,—to take Mr. Hoffman's truck,—to haul his stuff down at the house and operate the still in his house. Q. Did he discuss with you anything about the proceeds,—whether he was to share in the proceeds? A. He said he was to go in with this man and was to receive a share of the proceeds of the still. Q. He did not tell you how much was to be his share? A. No, he did not say. Mr. St. Clair was to operate the still and he was to get a share of the proceeds from the still. . . .

"Q. Where was the still in the house? A. It was a one-story house with a frame basement, and the still was in the basement. Q. What was the condition of the still when you went down there? A. Full operation. The fire under it. It had one of these large oil burners, and the still was steaming and boiling. Q. Did you find any finished product around the place? A. No, the still had just been set up; was just nicely warmed up. It was full of the strained mash. When they put the mash in the still they strain it, and put the liquid part into the still; and the still was full of the liquid part of the mash."

The other two officers who were present when the arrest was made testified to substantially the same effect. It will be observed that it does not appear from the testimony that intoxicating liquor had actually

been produced, but it shows that it was in the process of manufacture. The statute (Rem. Comp. Stat., § 7309) [P. C. § 3166], provides, among other things:

"It shall be unlawful for any person to manufacture . . . intoxicating liquor, . ."

In *People v. Nanninga,* 213 Mich. 354, 181 N. W. 1014, upon a like statute, the supreme court of the state of Michigan held that to manufacture means not only to produce or create, but covers as well the active efforts and means employed in the making of intoxicating liquor, and that one actually engaged in the effort, having assembled and actually using the method and means calculated to that end, is within the statute. It is there said:

"It is urged in behalf of respondent that, to manufacture intoxicating liquor, the liquor must have an actual existence, and not a mere potential one. The statute (Act No. 53, § 2, Public Acts 1919) provides that:

" 'It shall be unlawful for any person . . . to manufacture . . . intoxicating liquors.'

"Many definitions of the word 'manufacture' are to be found in the books, but most of them are of little help upon the question presented; for we must construe the meaning here, having in mind its sense in connection with the prohibition imposed. The purpose of this statute is to prohibit all manufacture of intoxicating liquors, except for the permitted purposes, and it reaches and stops all steps in the actual process of manufacturing, up to and including the finished product. That respondent was actually engaged in making whisky is conceded; but it is claimed that, because his efforts to that end were arrested by the arrival of the police, he is not guilty of manufacturing. The construction contended for is too narrow, and would lead to the absurdity that the law only prohibits the finished product, and not any of the intermediate steps or the energy applied and the means employed toward accomplishing the end in view.

"To manufacture, within the purview of this statute, means not only to produce or create, but covers as well the active efforts and the means employed in making the prohibited liquor. There can be no intoxicating liquor distilled, without effort, assisted by means of producing; and one actually engaged in the effort of making such liquor, having assembled and actually using the method and means calculated to that end, falls within the statute making it unlawful to manufacture intoxicating liquor. It would be paradoxical to hold that a man who had read up on how to make whisky, and had equipped himself with all the appliances for doing so, and gathered all the necessary ingredients, and was actually making whisky, was not making whisky.

"The statute is clear enough, and its object and end must not be defeated by a construction under which the finished product only is considered, and not the actual manufacture of the prohibited liquor."

In *State v. Ihan,* 129 Wash. 279, 224 Pac. 935, this court held to substantially the same effect.

Under the evidence quoted and the law as stated, it is clear that the appellant was guilty of unlawfully manufacturing intoxicating liquor.

It is further argued that, since there was no direct evidence as to what the mash was to be used for, or what the still referred to in the testimony was capable of producing, the jury were not justified in finding the appellant guilty. It is true that nowhere in the testimony it is stated that the still was such as could or might be used in the production of intoxicating liquor, or that the mash was of a character which by any process would produce such liquor. The testimony shows that, in the basement of the appellant's home, there was a fifty-gallon still full of mash in operation, and that there were two hundred gallons of mash in barrels in the basement. There is also testimony that the appellant, when asked by the officer why he mixed up

with the man who was associated with him, because that party had a bad reputation, stated that at first he had refused to go in with him, and that finally it was made plain by St. Clair that they could make some money and he finally agreed to go with him. They were to share in the proceeds of the sale. As we view the testimony, there is but one inference that can be drawn from it, and that is that the appellant and St. Clair were engaged in the manufacture of intoxicating liquor, and not of some other product which would not be subject to the ban of the statute.

The motion for a directed verdict at the conclusion of all of the testimony seems to have been presented on the theory that, while the appellant was engaged in the process of manufacturing intoxicating liquor, yet he was not guilty because, at the time of the arrest, no intoxicating liquor had been actually brought into existence.

The evidence was sufficient to sustain the verdict. The judgment will be affirmed.

Parker, Fullerton, Bridges, and Mitchell, JJ., concur.

Tolman, J. (dissenting)—It should be remembered that this is a criminal case and no man should be convicted of crime on suspicion or speculation. It would have been simple for the state to have shown that the so-called mash was such as would, in due course, make intoxicating liquor and was not innocent chicken feed. Also to have shown that the so-called still was designed for the purpose. The lack of such evidence, in my judgment, left the jury to speculate.