# Richmond

## W. B. TRENT V. COMMONWEALTH.

January 27, 1931.

Present, Campbell, Holt, Epes, Gregory and Hudgins, JJ.

*A. L. Pitts, Jr.,* and *Hubard & Boatwright,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

HOLT, J., delivered the opinion of the court.

From the evidence it appears that some of the officers of Buckingham county had reason to suspect that a still was being operated there, and in April, 1929, went to look for it. They found a boiler set up and some mash prepared. This was about ten o'clock at night. The still was not in operation and no one was seen near it. These officers hid themselves and remained on watch till about ten o'clock next morning when the accused, a negro, and two white men appeared. Each of them was carrying certain articles. Trent had a bag filled with empty fruit jars which he put down some distance from the still. They built a fire under the boiler and were busy about it when one of the officers unwittingly gave an alarm. All ran. Trent and a white man named Stinson were captured. The other fugitive got away. A search about the place was then made, but no still worm was found.

In due course an indictment followed. It contained two counts. One charges the unlawful manufacture of ardent spirits, and the other the unlawful possession of a still, still cap, etc. It is with a verdict based upon the first count alone that we are now concerned.

The verdict was: "We, the jury, find the accused guilty as charged in the first count of the indictment and fix his punishment at six months in jail and a fine of $25.00."

This is the testimony as to what occured at the time of the arrest:

R. G. Garnett, a county officer, testified that when the presence of the officers became known all of the men at the still ran. Trent and Stinson were caught, but the third man got away. As the accused and his companion approached the still "they laid down what they were carrying on their backs and got up a turn of wood apiece, and began stirring about the place, and some of them started a fire under the boiler." After the arrest, "they went up the path and found two or three bags which contained fruit jars, one of which the defendant had carried but they were not brought down to the site of the still, but were on the side of the path near there and that there was no whiskey found at the still. All of them went to work around the still, built the fire under the still, stirred the mash, all of them worked and looked like each one knew his business. The water in the boiler was steaming."

Herbert Goodman, another officer, said "that the officers stayed concealed until about ten next day when two men approached the still; that they came from the opposite side from where witness was hid and that in the woods and bushes he did not see but two, but Trent put down the bag and picked up sticks of wood and carried them to the still and they soon had a fire."

R. E. Newton, town sergeant of Dillwyn, saw Trent and two white men go to the still. "Trent had a sack on his back, but that he did not carry it to the still, but laid it down on the path some distance from the still; that some of the men, he could not see which one as he was seventy-five or one hundred yards away, started a fire at the still."

The accused testified on his own behalf. He said "that on the morning when the raid was made a man whom he did not know met him and Stinson in path *on* and told him that he wanted him to go down in the woods with him a little way to help carry some bundles that he had in a sack and that he and Stinson went down there; he carried

the sack that the white man had, and down in the woods they picked up two more sacks with glass jars in them, there being a case of glass jars in the sack which he carried; that when they approached the still the man told him what was done there in the bottom and he would not carry the jars down to the still but set them down on the side of the path where he was and went on down to the still and sat down on a barrel; that before they had been there but a few minutes one of the officers fired a shot and all of them ran. That the white man that he went down there with said that he was to be met there by some other parties and that as he did not find them there he gathered up some leaves and sticks and made a little fire "just to let the other boys know I have been here."

"That witness (Trent) took no part in the operation in any shape or form and had nothing to do with the still; that he knew that a bunch of men, five or six, from Powhatan county, were operating a still in that vicinity, but he did not know the names; that he had seen the man he went down there with before, but he did not know who he was except that his first name was Percy."

He further stated that he had on other occasions aided officers in securing evidence against violators of the prohibition laws, and had been requested by Mr. Hughes, a State prohibition inspector, to keep him informed of such unlawful activities as might come to his attention; that his presence at the still on this occasion was for the purpose of securing such evidence, and that he had already come into possession of information which led him to believe a still was being operated in that vicinity.

Mr. Hughes said that Trent, on two occasions, had furnished evidence of this kind, and that a day or two before his arrest he had told him that there was a still where that captured was found. Hughes then told Trent to investigate this matter and let him know when a run was

to be made. This Trent promised to do, but asked Hughes to keep quiet since he did not wish his name to be known should an arrest be made.

Had the jury a right to disregard Trent's explanation of his presence at the still? This detective knew his associate who was captured, but the man who got away was a stranger to him. He said that he sat around and did nothing beyond making a little fire with sticks and leaves to "let the boys know that he had been there." As a matter of fact, the only fire built was that under the boiler. Garnett said that they went about this business in a business-like way, everybody seemed to know what he was doing, and that the boiler was steaming when they were interrupted.

When Trent was overtaken and arrested it would have been very natural for him to explain at that time or soon afterwards the purpose of his presence, but he did not. No one of these facts, nor all of them combined, are sufficient to have made the jury of necessity discredit his defense, but they unquestionably are amply sufficient to throw doubt upon his explanation. The jury heard him testify and manifestly did not believe him. They are supported in this conclusion by the trial judge. They were of opinion that the *prima facie* presumption of guilt, declared by statute to follow one's presence at a still in operation, had not been overcome, and in this we find no error. It is hazardous to "run with the hounds and hold with the hare."

█ It is said that the indictment charges intoxicants were manufactured when such was not the case; but it is to be remembered that manufacturing is a continuing process and the State is not obliged to wait until it is completed before proceeding to punish those who in this manner violate its laws, nor to concede that only a misdemeanor has been committed up to the moment when alcohol actually begins to flow.

*People* v. *Nanninga*, 213 Mich. 354, 181 N. W. 1014, 1015, is a case in which the defendant possessed all the necessary paraphernalia but had produced no finished product. The Michigan statute (Pub. Acts, 1919, No. 53, section 2), provides that "it shall be unlawful for any person * * to manufacture * * intoxicating liquors." In that case the court said: "Many definitions of the word 'manufacture' are to be found in the books, but most of them are of little help upon the question presented; for we must construe the meaning here, having in mind its sense in connection with the prohibition imposed. The purpose of this statute is to prohibit all manufacture of intoxicating liquors, except for the permitted purposes, and it reaches and stops all steps in the actual process of manufacturing, up to and including the finished product. That defendant was actually engaged in making whiskey is conceded, but it is claimed that, because his efforts to that end were arrested by the arrival of the police, he is not guilty of manufacturing. The construction contended for is too narrow and would lead to the absurdity that the law only prohibits the finished product, and not any of the intermediate steps or the energy applied and the means employed toward accomplishing the end in view.

"To manufacture, within the purview of this statute, means not only to produce or create, but covers as well the active efforts and the means employed in making the prohibited liquor. There can be no intoxicating liquor distilled without effort, assisted by means of producing; and one actually engaged in the effort of making such liquor, having assembled and actually using the method and means calculated to that end, falls within the statute making it unlawful to manufacture intoxicating liquor. It would be paradoxical to hold that a man who had read up on how to make whiskey, and had equipped himself with all the appliances for doing so, and gathered· all the

necessary ingredients, and was actually making whiskey, was not making whiskey."

In *State* v. *Lehna*, 47 S. D. 115, 196 N. W. 495, it appears that the officers discovered mash in process of fermentation, a copper boiler, coil and gasoline stove. It was urged by the defendant that the statute prohibiting the manufacture of an intoxicating liquor had not been violated in that there never was any finished product. The court cited with approval and followed *People* v. *Nanninga*, *supra*. See also *State* v. *Ihan*, 129 Wash. 279, 224 Pac. 935; *State* v. *Hoffman*, 132 Wash. 363, 232 Pac. 278; and *State* v. *Ravan*, 91 S. C. 265, 74 S. E. 500. In this case there was a dissenting opinion. It has been held that the production of the finished product is necessary before the offense of manufacturing is consummated. *Commonwealth* v. *Saler*, 84 Pa. Sup. Ct. 281. This construction sustains neither the spirit nor the purpose of our statute and runs counter to the long history of anti-liquor legislation in Virginia.

It is true that in the brief filed on behalf of the Commonwealth is this admission: "It is freely admitted that under the evidence in this case the accused, so far as the Commonwealth knows, did not manufacture liquor."

It is certain that there was no finished product, but if this *concessum* means more it goes beyond the necessities of the case, but let us for the sake of argument assume that this finished product is necessary before a conviction under our statute can be had for the unlawful manufacture of intoxicating liquors. We reach the same results.

Section 4 of the prohibition act (Acts 1924, chapter 407) provides in part as follows: "On an indictment or information for the violation of any provisions of this act, the jury may find the defendant guilty of an attempt, or of being an accessory, and the punishment shall be the same as if the defendant were solely guilty of such violation."

The consummated crime and the attempt by statute

stand upon exactly the same footing and the punishment in each instance is the same.

Into each indictment charging unlawful manufacture of intoxicants the statute writes the charge of an attempt and so there is no variance in the verdict. The defendant did that with which he is charged.

Moreover, section 6363 of the Code in part reads: The judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it."

■ ■ It is further contended that the evidence does not sustain even a conviction for attempt in that it is impossible to carry out the processes of distillation without a "worm." The doctrine of attempts is full of subtleties and has been elaborately examined both in this country and abroad. For our purpose it is sufficient to say that if the instrumentalities adopted were apparently suitable for the consummation of the crime, that is enough. If they were manifestly insufficient, then this prosecution is at an end. This consummation must not be inherently impossible and the impossibility must not be due to some extraneous fact not within the knowledge or control of the accused. Wharton's Criminal Law (11 ed.), section 221; *Andrews* v. *Commonwealth,* 135 Va. 451, 115 S. E. 558; *Collins* v. *Radford,* 134 Va. 518, 113 S. E. 735; *Lynch* v. *Commonwealth,* 131 Va. 769, 109 S. E. 418; *Hicks* v. *Commonwealth,* 86 Va. 223, 9 S. E. 1024, 19 Am. St. Rep. 891; *Uhl* v. *Commonwealth,* 6 Gratt (47 Va.) 706.

One might be guilty of attempting to pick the pocket of a wholly impecunious citizen but he could not be guilty of attempting to pick the pocket of a stone image.

It is inherently and patently impossible to distill alcohol without the aid of some device which serves the purpose of a "worm." And so if we were to assume that the "worm" was in fact absent that would end this case.

The accused and his associates must have been intimately familiar with the essentials of this operation and went about it in a business-like way. He was no stranger to the locality, for when some distance away he gathered up his "turn of wood" and went straight to the still. He must have built the fire under it, for he admits building a fire and there was but one fire started. So from the evidence it appears that this case does not rest upon the *prima facie* presumption arising out of presence at a still, section 20 of the prohibition act (Acts 1924, chapter 407, section 20, as amended by Acts 1926, chapter 231), but upon active participation in the processes of manufacture.

We would have to be more than ordinarily credulous to believe that these men did not know that a "worm" was absolutely essential, and so the conclusion is inevitable that this "worm" was where it was immediately available. In all human probability it was hidden near by in the woods where the officers could not find it.

Impossibility of performance arose not out of the absence of a "worm," but out of intervention of the officers whose presence made further preparation inexpedient.

■ Error is assigned because instructions for the Commonwealth numbered 1 to 5 were given and because the court refused to give for the defendant instructions D and E.

The assignments in the petition for writ of error deal only with instructions for the Commonwealth numbered 1, 2, 3 and 5. None of them can be considered. These exceptions took this form: "The court having fully heard argument upon the instructions gave instructions numbered 1 to 5 for the Commonwealth, to the giving of which instructions numbered 1 and 5 the defendant by counsel objected and excepted, fully stating his reason to the court and the court gave instructions A, B and C offered by the defendant and refused to give instructions D and E, to

which action of the court the defendant by counsel excepted, fully stating reasons why said instructions should be granted and defendant now tenders his bill of exceptions to the giving by the court of instructions numbered 1 and 5, and refusing to give instructions D and E, and prays that this bill of exceptions may be signed, sealed and made a part of the record, which is accordingly done."

In Rule XXII of rules of court, it is provided that:

"In civil and criminal cases, all objections to writs of every kind, pleadings, instructions, notices, the admissibility of evidence, or other matters requiring a ruling or judgment of the trial court, shall state with reasonable certainty the ground of such objection, and, unless it appears from the record to have been so stated, such objection will not be considered by this court except for good cause shown, or to enable this court to attain the ends of justice."

In *Kelly* v *Schneller*, 148 Va. 573, 139 S. E. 275, 277, Mr. Justice Campbell, in commenting upon this rule and the necessities therefor, said:

"Whether or not these instructions are amenable to the objections urged in the oral argument, we are, under Rule XXII of this court, precluded from passing upon. The object of this salutary rule is not to penalize a litigant who fails to preserve, by bill of exception or certificate, the adverse ruling of the court when the objection thereto is plainly made to appear from the record in some other form, but its object is to compel litigants to present to this court the same objections urged upon the trial court. *Levine* v. *Levine*, 144 Va. 330, 132 S. E. 320; *Keeney* v. *Commonwealth*, 147 Va. 678, 137 S. E. 478."

See also *Norfolk So. R. Co.* v. *Lewis*, 149 Va. 318, 141 S. E. 228; *Universal Motor Co.* v. *Snow*, 149 Va. 690, 140 S. E. 653, 59 A. L. R. 1174; *Kercher's Adm'r* v. *R., F. & P. R. Co.*, 150 Va. 108, 142 S. E. 393; *Kessler* v. *Friedman*, 152 Va. 446, 147 S. E. 201.

This court cannot possibly know what reasons were assigned in the court below when these exceptions were taken.

Upon the whole case we are of opinion to affirm the judgment of the trial court.

*Affirmed.*

EPES and HUDGINS, JJ., dissenting.