## Richmond

ROBERT ANDERSON v. COMMONWEALTH OF VIRGINIA.

October 12, 1953.

Record No. 4125.

Present, All the Justices.

The opinion states the case.

*A. Clair Sager*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *G. Stanley Clarke, Assistant Attorney General*, for the Commonwealth.

MILLER, J., delivered the opinion of the court.

Robert Anderson was indicted under section 4-57, Code of 1950, for unlawfully and feloniously manufacturing al-

coholic beverages. He was tried by the court, found "guilty of an attempt to manufacture illegally alcoholic beverages * * *," and sentenced to confinement for one year in the penitentiary.

The punishment for an attempt to manufacture illegally alcoholic beverages is the same as that prescribed for the actual illegal manufacture. Section 4-87, Code of 1950. Thus the punishment inflicted was warranted if an attempt to manufacture was proved.

Whether, when all just inferences that may be drawn from the proved facts are resolved in favor of the Commonwealth, the evidence is sufficient to sustain the conviction is the sole question presented.

On July 24, 1952, the local sheriff and other officers had reason to believe that alcoholic beverages were being manufactured on a secluded tract of woodland known as Hell's corner in Lunenburg county, and that afternoon they went in search of the still. About 4:30 p. m., after having driven some distance into the woods along an old, and until recently unused, sawmill road, the officers met an approaching car, which was being driven by accused, accompanied by another man. When the vehicles were about "ten or fifteen steps" apart, accused and his companion alighted and fled into the woods. They were pursued by the officers on foot but only Anderson was apprehended.

The rear seat of Anderson's automobile had been removed and particles of meal and shipstuff were on the floorboards. Accused was placed in the officers' car, and the tire tracks made by his vehicle were traced back along the old road about one-quarter of a mile. While this was being done, accused told the officers where the still was located and how to reach it. The road was followed as far as a passenger car could be operated thereon and to a point where a wooden slide was found and a mule was tied nearby in the woods. The slide tracks were traced several hundred yards farther, and there a 150-gallon metal boiler erected on cinder blocks with a hole bored therein, a steam pipe to be fitted into the

hole, a 180-gallon doubler, ten 180-gallon empty fermenters, six 180-gallon fermenters filled with about 1,000 gallons of fermenting mash, a 60-gallon barrel, and numerous empty sugar bags were found. No copper coil or worm was located, nor did it appear that any liquor had been actually run because there was no indication that the boiler had been fired.

At the trial Sheriff Shackelton testified that he asked accused: "When are you going to make a run?" and he said, "I don't know. We have just mashed in."

The sheriff gave his opinion on the degree of fermentation of the mash as follows:

"A. I think it was six of those barrels which had been mashed in. I don't think it would have run, certainly, before the next day, probably two days after that. But sugar like that will make it work a whole lot faster than meal, * * *""

J. L. Blackburn, an Alcoholic Beverage Control inspector, who participated in the raid, testified thus to the condition of the mash:

"Q. And I believe you stated, and you have had considerable experience with such things, that in your opinion the mash would not be ready to run until probably the following day.

"A. That would have been my opinion, that it would have been running the next day; or, actually it could have been running that day. It is hard to determine that difference. I do not think it would have run its peak until the next day. They usually wait until it actually reaches its peak before they pour it into the still."

When accused testified, he said that he and the other man, whom he identified as James Henderson, had gone to Richmond the previous afternoon and secured the sugar, shipstuff and meal and had arrived in the woods near the still around 9 o'clock the morning of his arrest and the ingredients had been unloaded from his car. He contradicted what he said on the day of his arrest and denied having gone down to the

still but said that on July 24 he had waited in his car in the woods from 9 o'clock in the morning until Henderson came back from the still just before the two fled into the woods. On direct examination, when questioned about the coil, accused testified as follows:

"Q. Now, what do you know about the coil? Was there anything said about a coil or worm?

"A. Henderson said to me, he said, asked me if I had a truck and I told him 'No.' And he said, 'I reckon I can get somebody to come back up here tonight to bring the worm and some more stuff.' I told him I didn't have a truck to haul that in.

"Q. Did he state where he wanted you to get the worm?

"A. He said he had it in Richmond and he wanted me to pick it up and bring it out.

"Q. He said he wanted you to go to Richmond and bring it out?

"A. Yes, sir."

It appears that accused had been at the still throughout the day, and when arrested, six barrels of mash had been made and were fermenting and then ready for distillation, or would be ready the next day at such hour as the operators might desire to make a run. Connection of the coil and starting of a fire was all that remained to be done before actually running the liquor.

In 14 Am. Jur., Criminal Law, section 65, p. 813, the following definition of attempt is given:

"An attempt to commit a crime is any overt act done with the intent to commit the crime and which, except for the interference of some cause preventing the carrying out of the intent, would have resulted in the commission of the crime. * * *"

In section 68, p. 816, the necessary overt act is characterized as follows:

"In other words, while it need not be the last proximate act to the consummation of the offense attempted to be perpetrated it must approach sufficiently near to it to stand

either as the first or some subsequent step in a direct movement toward the commission of the offense after the preparations åre made. * * *"

Similar definitions of an attempt and of an overt act are found in 22 C. J. S., Criminal Law, sections 73, 74, and 75.

In *Trent* v. *Commonwealth*, 155 Va. 1128, 156 S. E. 567, the facts were quite similar to those disclosed by this record, and there, as here, no coil or worm was found. The accused was convicted by a jury of manufacturing illegally alcoholic beverages. On appeal, we held that the proof established an attempt to manufacture; and as the statute provided the same punishment for an attempt as was fixed for the accomplished act, the conviction was not disturbed. In the opinion rendered by Justice Holt, he said:

"It is said that the indictment charges intoxicants were manufactured when such was not the case; but it is to be remembered that manufacturing is a continuing process and the State is not obliged to wait until it is completed before proceeding to punish those who in this manner violate its laws, nor to concede that only a misdemeanor has been committed up to the moment when alcohol actually begins to flow. * * * (At page 1133)

"We would have to be more than ordinarily credulous to believe that these men did not know that a 'worm' was absolutely essential, and so the conclusion is inevitable that this 'worm' was where it was immediately available. In all humán probability it was hidden near by in the woods where the officers could not find it.

"Impossibility of performance arose not out of the absence of a 'worm', but out of intervention of the officers whose presence made further preparation [attempt] inexpedient." (At page 1137)

In *State* v. *Jackson, et al.*, 210 S. C. 214, 42 S. E. (2d) 230, the court decided that a conviction for an attempt to manufacture was sustained where the evidence showed that the still had been assembled and "the mash in the vat had nearly reached the stage of fermentation when all that remained to be done was to build a fire thereunder * * *."

Anderson relies upon the decision of *West* v. *Common-wealth*, 156 Va. 975, 157 S. E. 538, where the conviction of accused upon an indictment that contained one count for manufacturing and another for aiding and abetting in the manufacture of ardent spirits was reversed on appeal. That case is, however, readily distinguishable from the one at hand. There the immediate operators of the still had been arrested and the still taken into possession by the officers some fifteen hours before the accused drove his truck loaded with "quantities of sugar, coal, rye, flour, yeast and corn meal and a number of five-gallon jugs" to within 200 yards of where the still had been in operation. The court said that "the crime of manufacturing ardent spirits had been fully consummated fifteen hours before the accused appeared on the scene. He was not in a situation in which he might have rendered any aid and assistance to the perpetrator." Whether or not the accused was guilty of an attempt was not in issue because hours before he came anywhere near the scene of the still, the officers had taken it into possession.

In *Powell* v. *State*, 128 Miss. 107, 90 So. 625, 22 A. L. R. 225, the activities of accused toward final consummation of his purpose had not progressed as far as here for the significant steps of mixing and setting aside the mash for fermentation had not been taken, but his conviction for an attempt to manufacture was sustained. Powell and his companions had taken three motor cars laden with a copper still, a number of barrels, 1,500 pounds of sugar, several hundred pounds of meal, bran and shorts, and considerable camp equipment, traveled far into the country along a public road and then into the forest along a route blazed on the trees. The caravan, however, became mired in "Pigeon Roost bottom" before it reached its objective, an isolated spot near a spring. The camp equipment was then unloaded and moved to this spot and a tent erected, but while the distilling apparatus was being moved, the parties participant were arrested. No mash had been made or any fire built at the time of the arrest. It was insisted by accused that no overt act was shown on his part and that nothing more than

preparation to commit the offense had been proved. Yet the conviction for an attempt to distill illegally intoxicating liquors was sustained. The court said:

"The act directed toward the commission of the intended offense, after the preparations are made, need not be the last proximate act, such as making the mash, before the consummation of the offense, in order to constitute an overt act; but the act of the appellant toward the accomplishment of the proposed crime, if sufficiently near and proximate as to reasonably lead to consummation if uninterrupted, constitutes an overt act." (At page 110)

In the case now before us, whether or not the coil was hidden in the woods nearby or was to be obtained elsewhere is not controlling. Nor was the court called upon to accept Anderson's testimony as to its whereabouts. Distillation of ardent spirits is a progressive undertaking and steps toward its consummation had been taken. From all the facts in evidence the court was justified in inferring that the coil was readily available for the purpose intended. In any event, it appears from Anderson's testimony that the coil was available and that Henderson proposed to secure it that night, and officer Blackburn said that the mash could be run on that or the next day.

It might be plausibly contended that accused and his companion had proceeded beyond the stage of a mere attempt and were actually engaged in manufacturing ardent spirits. With the boiler in place and all other necessary apparatus available, they mixed the mash and waited its fermentation to a stage where it was ready or about ready to run into the finished product. If they were not on July 24 actually manufacturing, certainly overt acts and steps in direct and certain sequence towards final consummation had been taken, sufficient to constitute an attempt to manufacture. The judgment is sustained by the evidence and must be affirmed.

*Affirmed.*

SMITH, J., dissenting.

When the facts, as set forth in the majority opinion, are measured by the rule of *Trent* v. *Commonwealth*, 155 Va. 1128, 156 S. E. 567, the decision reached apparently follows. However, I don't believe that the record supports the factual conclusion reached. A few excerpts from the testimony of each of the Commonwealth's witnesses show why this is true.

J. L. Blackburn, the A. B. C. investigator, has this to say:

"Q. Was it ready for distillation?

"A. I don't believe it was quite ready. I think it would have been ready the next day. Of course, they run that stuff quite sometime—you just can't tell when they are going to run it. It is hard to tell. From the evidence there, they had not operated the still. The mash was there, but they had never completely set up the still. They had put up the boiler there and they had bored a hole in the top of the still and were just finishing setting up the still. I imagine they would have been operating the next day.

   *     *     *     *     *     *     *

"Q. Was any pipe leading from the doubler?

"A. No, sir.

"Q. And was there any condenser or what you would term a coil there?

"A. No, sir. Actually the still had not been put in place. It was right there but had not been put in place like they usually do them."

Sheriff A. B. Shackelton testified, in part, as follows:

"Q. Was it a complete distilling apparatus from your own experience?

"A. No, sir. The worm had not come nor the cap there. I don't think. (Addressing the Court.) But Mr. Blackburn took a memorandum of what was there, Judge; I didn't.

"Q. And it was not connected up?

"A. No, sir.

"Q. And from what you saw the day following the apprehension, the still had not yet been operated?

"A. No, sir; I don't think so."

On this phase of the case Deputy Sheriff H. S. Wallace was questioned as follows:

"Q. What did you find at the still?

"A. We found the barrels as Mr. Blackburn told you, and the meal and chipstuff; and the boiler was sitting on the furnace but had not been coupled up.

"Q. Had you seen distilling equipment similar to that you saw on this occasion?

"A. Yes, sir; I had seen a lot of them.

"Q. Was a complete distilling unit there?

"A. I didn't ever see any worm where they cool the whiskey with. There is so much red tape in putting up these things I believe I could not put up one if you laid it out here on the floor."

The defendant's testimony as to the whereabouts of the coil or worm is set out in the majority opinion and need not be repeated here.

It is clear from the testimony that the defendant and his accomplice were making preparations to illegally manufacture alcoholic beverages, and were guilty of illegally possessing distilling apparatus in violation of Code, § 4-77 and should have been punished only under count # 2 of the indictment. Nowhere does the evidence show, however, that the accused had gone beyond the stage of preparation.

The authorities agree that it is impossible to formulate a general rule or definition of what constitutes an attempt which may be applied as a test in all cases and that each case must be determined on its own facts. Although it is difficult to draw a fine line of distinction between the point where preparations end and an attempt begins, this does not eliminate the fact that this distinction exists. Preparations consist in devising or arranging the means or measures necessary for the commission of the offense; while the attempt is the direct movement toward the commission after the preparations are

made. The majority have failed to recognize that in the chain of events which constitutes the illegal manufacture of alcoholic beverages there is a clear distinction between preliminary preparation on the one hand and the beginning of the consummation on the other hand. It is only the latter which is the attempt.

In the *Trent case* this court stated that, "It is *inherently and patently impossible* to distill alcohol without the aid of some device which serves the purpose of a 'worm.' (Italics added). And so if we were to assume that the 'worm' was in fact absent that would end this case." The court then went on to say that in the absence of other testimony it would assume that the worm was in close proximity. However, it will be recalled that in the *Trent case* the still had been in operation, whiskey had been manufactured, and there was a fire under the boiler and all the evidence pointed to the consummation of the act. It was under this state of facts that the court made its assumption that the worm was present.

There is a vast difference between the facts here and those in the *Trent case*. The defendant's uncontradicted testimony places the worm in Richmond, which, coupled with the unanimous testimony of the Commonwealth's witnesses that the still was not in operating condition, removes any basis for an assumption that there was a worm in the vicinity and takes this case outside the rule laid down in the *Trent case*.

To manufacture liquor it is necessary to assemble and mix various materials and store them to await the period of fermentation. While there is no evidence before us as to the exact time required for this process, we may say with reasonable assurance that it is at least several days. Besides the raw materials, a still complete with boiler and worm is needed to complete the process of distillation. The uncontradicted testimony establishes the fact that the mash was not ready for distillation and that the still was not in condition to accomplish the distillation process. The consummation of the crime of manufacturing alcoholic beverages was then

impossible and, therefore, there was no attempt to commit that crime. In my opinion the defendant's activities never reached beyond the preparations stage and it follows that the evidence does not support his conviction beyond a reasonable doubt of an attempt to manufacture alcoholic beverages without a license.